1 J. CHRISTOPHER JORGENSEN, ESQ.
STATE BAR NO. 5382
2 DIANA S. ERB, ESQ.
STATE BAR NO. 10580
3 LEWIS AND ROCA LLP
3993 Howard Hughes Pkwy., Ste. 600
4 Las Vegas, NV  89169
(702) 385-3373
5 (702) 949-8398/fax

6 Attorneys for Defendant, Mortgage Electronic
Registration Systems, Inc.
7

8                    UNITED STATES DISTRICT COURT

9                     FOR THE DISTRICT OF NEVADA

10 SAM HUYNH,                          | Case:

11                    Plaintiffs,

12        vs.                          | **DEFENDANT MORTGAGE
                                         ELECTRONIC REGISTRATION
13 MORTGAGE ELECTRONIC                   SYSTEMS, INC.'S NOTICE OF
REGISTRATION SYSTEMS, INC.; PRADO        REMOVAL OF CIVIL ACTION**
14 MORTGAGE; DIRECT EQUITY
MORTGAGE; COUNTRYWIDE HOME
15 LOANS; et al.,

16                    Defendants.

17 TO:   THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR
18       THE DISTRICT OF NEVADA:

19       The removing party, Mortgage Electronic Registration Systems, Inc., respectfully shows:

20       1.      Mortgage Electronic Registration Systems, Inc ("MERS"), is a Defendant in the

21 above-entitled action.

22       2.      That the above-entitled action was commenced in the Eighth Judicial District Court

23 of the State of Nevada, in and for the County of Clark, and is now pending in that Court under the

24 designated Case No. A566611, Department XVII.

25       3.      Process was served upon Petitioner MERS herein on August 5, 2008, by service

26 upon its resident agent.

27

28

4.      This case involves claims by the pro se Plaintiff that the Defendants improperly processed, serviced, and transferred his home mortgage loan. Although it is difficult to determine from the Complaint exactly what the allegations against the named Defendants are, Plaintiff seems to allege that Defendants did not properly make the disclosures required by 15 U.S.C. §1601 and 12 USC §2605, TILA, RESPA and HOEPA.

This case is one of many that have recently been filed across the country by homeowners seeking to simply stall or delay foreclosure proceedings after the plaintiffs have long stopped making the required mortgage payments.

5.      Plaintiff's claims appear to be based on alleged violations of federal statutes. Defendant denies such violations.

6.      These claims are completely preempted by the provisions of the federal statutes and Plaintiff's claims must be recharacterized as federal claims for relief.

7.      Defendant MERS is entitled to remove this action to this Court under 28 U.S.C. §1441 on the grounds that this Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §1331 in that, under the complete preemption doctrine, it is an action arising under the laws of the United States, specifically the provisions of the National Bank Act and provisions of the Truth in Lending Act, 15 U.S.C. §1601 et seq., 15 U.S.C. §2601, 1602(f) and Regulation Z §226.2(a)(17).

8.      Supplemental jurisdiction of any state law claims is proper under 28 U.S.C. §§1367(a).

9.      Thirty days have not elapsed since Defendant was served with the summons and complaint in this action.

10.      Copies of all process, pleadings and other orders served upon Petitioner are attached hereto.

1    11.    A true and correct copy of this Notice of Removal will be filed with the Clerk of

2  the Eighth Judicial District Court of the State of Nevada, Department XVII.

3

4    WHEREFORE, Petitioner prays that this action be removed.

5    DATED this 25 day of August, 2008.

6                                          LEWIS AND ROCA LLP

7

8                                          By _____

9                                              J. CHRISTOPHER JORGENSEN, ESQ.
                                               STATE BAR NO. 5382
                                               DIANA S. ERB, ESQ.
10                                             STATE BAR NO. 10580
                                               3993 Howard Hughes Pkwy., Ste. 600
11                                             Las Vegas, NV  89169
                                               Attorneys for Defendant MERS

12

13

14

15                              **CERTIFICATE OF SERVICE**

16    Pursuant to Nev. R. Civ. P. 5(b), I hereby certify that service of the foregoing document
   was made on the 25 day of August, 2008, by depositing a copy for mailing, first class mail,
17  postage prepaid, at Las Vegas, Nevada, to the following:

18

19  Sam Huynh
    7548 Kalmalii Avenue
20  Las Vegas, NV 89147
    Pro Per Plaintiff

21

22

23                                          _____
                                            an employee of Lewis and Roca LLP
24

25

26

27

28

## ORIGINAL

1  RECORDING REQUESTED BY Plaintiff Sam Huynh
2  AND WHEN RECORDED MAIL TO

**FILED**

3  Sam Huynh
   7548 Kalmalii Ave.
4  Las Vegas, NV. 89147

JUL 2 9 17 AM '08

5

6  CLERK OF THE COURT

7

8  SPACE ABOVE THIS LINE FOR RECORDER'S USE

9

10                    DISTRICT COURT

11                 CLARK COUNTY NEVADA

12  SAM HUYNH

13                    Plaintiff,             Case No.    A566611

14  V.                                       Department::   XVII

15
    Mortgage Electronic Registrations System, Inc.;
16  Prado Mortgage.; Direct Equity Mortgage;       NOTICE OF PENDENCY OF ACTION
    Countrywide Home Loans; and Does 1-
17  X.Inclusive                                    NRS 14.010 Et. Seq.

18                    Defendant.

19

20

21                NOTICE OF PENDENCY OF ACTION

22  Notice is given that the above-entitled action was filed in the above-entitled court on June

23  ___, 2008 by Sam Huynh  Plaintiff, against Mortgage Electronic Registrations System,

24  Inc.; Prado Mortgage.; Direct Equity Mortgage; Countrywide Home Loans Defendants.

25  The action affects the title to a specific parcel of Real Property and the right to lawful

    possession of the same, the property location is: 7548 Kalmalii Ave. Las Vegas, NV.

    89147                                          1

CLERK OF THE COURT   JUL 2 9 2008   RECEIVED

1   APN: 177-21-219-108

2   and whose Legal description is as follows:

3

4           Unit (202) Building (4) of Park Avenue Condominiums Unit (3) as shown by
            Map thereof on file in Book (110) of Plats page (58), and as shown by
            Amended Plat of a Portion of Park Avenue Condominiums Unit (3) as filed
5           in Book (116) of Plats Page (100) in the office of the County Recorder of
            Clark County, Nevada
6

7   and which is identified in the complaint in this action. The property affected by the action

8   is located in the County of Clark, Nevada. The nature of the claims are (i)

9   DECLARATORY RELIEF (ii) INJUNCTIVE RELIEF (iii) FRAUD, (iv) Wrongful

10

11  Foreclosure (v) Defective Notices (vi) TO SET ASIDE FORECLOSURE SALE and (v)

12  Slander of Title

13  Dated July 1st, 2008.

14

15                                          Sam Huynh

16                                          Attorney for Plaintiff in Pro Se.

17                          ACKNOWLEDGMENT

18  Subscribed and sworn to before me this 1st day of July 2008

19

20

21  Notary Public in and for the county of Clark,
    State of Nevada
22

23                      YVONNE TOVES
                   Notary Public, State of Nevada
24                 Appointment No. 08-8853-1
                   My Appt. Expires Nov 14, 2011
25

26

27

28                                          2

---

ORIGINAL

FILED

JUL 2  9 17 AM '08

CLERK OF THE COURT

1   COMP
2   Sam Huynh
    7548 Kalmalii Ave.
3   Las Vegas, NV. 89147
    (702)-461-6188
4   Attorney for Plaintiff in Pro Se
5
                        DISTRICT COURT
6
                    CLARK COUNTY NEVADA
7
8   SAM HUYNH
9                                   CASE NO: A570606 1
                Plaintiff,
10                                  Department : XVI I
11  V.
12  Mortgage Electronic Registrations    COMPLAINT For:
    System, Inc.; Prado Mortgage.; Direct
13  Equity Mortgage; Countrywide Home     1. DECLARATORY RELIEF
    Loans; and Does 1-X.Inclusive
14                                        2. INJUNCTIVE RELIEF
                Defendants.
15                                        3. FRAUD
16                                        4. TO SET ASIDE  WRONGFUL
                                             FORECLOSURE Based on Fraud
17
                                          5. To set aside Foreclosure Sale
18                                           based upon Defective Appointment
19                                           of Trustee and Notices
20                                        6. Slander of Title
21                                        7. Lender Fraud
22                                        8. Civil Conspiracy
23                                        9. Breach of Fiduciary Duty
24                                        10. Statutory Violations of RESPA
25
26
27
28
    Plaintiff complains and for causes of action alleges as follows:

                                    1

1. Plaintiff Sam Huynh at all times relevant has been a resident of the County of Clark, State of Nevada and the owner of a parcel of Real Property, identified herein as: follows: 7548 Kalmalii Ave. Las Vegas, NV. 89147

APN: 177-21-219-108

and whose Legal description is as follows:

> Unit (202) Building (4) of Park Avenue Condominiums Unit (3) as shown by Map thereof on file in Book (110) of Plats page (58), and as shown by Amended Plat of a Portion of Park Avenue Condominiums Unit (3) as filed in Book (116) of Plats Page (100) in the office of the County Recorder of Clark County, Nevada

2. Defendant Mortgage Electronic Registration Systems Inc., ("MERS") at all times herein mentioned was doing business in the County of Clark, State of Nevada and alleged to be the Beneficiary regarding Plaintiff' Real Property as described above and as Situated in Clark County Nevada.

2. (b) Defendant Countrywide Home Loans ("Countrywide") at all times relevant was a Mortgage Loan servicer and lender doing business in the County of Clark and the State of Nevada and in that capacity had acquired the servicing rights to Plaintiff's Mortgage.

3. Defendant Direct Equity Mortgage ("Direct Equity") at all times relevant was a Mortgage Loan Broker doing business in the County of Clark and the State of Nevada and in that capacity had introduced Plaintiff to Defendant Prado Mortgage

4. Defendant Prado Mortgage ("Prado") at all times relevant was doing business in the County of Clark, and the State of Nevada as a funding source for mortgage loans.

5. Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES I through X, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend their complaint to allege their true names and capacities

2

when they have been ascertained.

6. Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned each of the defendants sued herein in relation to the property they claim an interest in was the agent and employee of each of the remaining defendants thereof and at all times was acting within the purpose and scope of such agency and employment.

7. On or about May 2006 Plaintiff contacted Direct Equity in regards to obtaining a loan for the acquisition of the foregoing referenced Real Property

8. On or about May, 2006, Plaintiff was introduced to Prado Mortgage ("Prado") who agreed to finance this acquisition

9. Prado at all times herein mentioned and on information and belief used one of the following or a substantially similar business model to originate mortgages to consumer borrowers and then pledged them to a secondary lender such as an investment bank or other financial institution in return for a loan under a revolving line of credit. (i) Prado was provided a line of Credit, (ii) As Prado generated mortgages, it would draw down on that line of credit to fund the mortgages until it had funded approximately $100 to $150 million or more in loans. (iii) When its loan volume reached that point, Prado would (iv)(a) issue bonds or notes to public investors that were secured by the repayment stream from the mortgage loans, or (iv) (b) sell the notes to the credit facilitator and (v) the securitization process would be underwritten by the investment bank, and (vi) (a) if Prado issued the securities Prado would simultaneously repay the credit line with part of the proceeds from the sales of the bonds and notes or (vi)(b) if the lender securitized the loans Prado was paid a profit based on the nature of the loan (vii) When and if Prado repaid its credit line, through either method the investment bank released its lien. (viii) Under this revolving credit system, the secondary lender provided both the credit facility, which Prado used to fund the

3

1 consumer mortgage loans, and underwriting services for Prado's public equity asset-

2 backed securitizations, (ix) The securitization process made possible a constant flow

3 of money to Prado, whereby the mortgage company was able to convert a long-term

4 revenue stream from the repayment of the mortgage loans to current income and to

5 capital with which to fund more loans. Meanwhile, the secondary lender would profit

6 from interest and fees as the credit line was repaid as well as from fees earned for

7 underwriting the securitizations. On information and belief Prado after the securitizing

8 of Plaintiff' loan was either the loan servicer, for Plaintiff' trust Deed and Note at issue

9 herein, or sold those rights to another mortgage company.

10 10. Under this scenario as described in paragraph (9) above the end result is a

11 division of the note into three parts, the lien holder, which under agreement is MERS,

12 and the real beneficiary are separated and divided into two parts and the note is

13 further separated from the payment stream and lien holder, and Note holder, thereby

14 creating yet a third division, which on information and belief would nullify a beneficial

15 interest in the Note as any beneficial interest has been so obscured by this separation

16 into three parts.

17 11. Defendant Prado upon funding caused Mortgage Electronic Registration Systems

18
19 ("MERS") to go on title as the "Nominee Beneficiary" in order to hide the true Identity

20 of the successive Beneficiaries when and as the loan was sold. MERS However acted

21 as if they were the actual beneficiary and signed documents as such. Which

22 documents and notices were signed unlawfully.

23 12. On information and belief a Nominee is a person or entity or organization in whose

24
25 name a security is registered though true ownership is held by another party, in other

26 words MERS is not the Beneficiary but is used to hide the true identity of the

27 Beneficiary.  Based on this failure to disclose, and the lack of consideration paid by

28 MERS, Plaintiff alleges that the Deeds of trust were never perfected and are a nullity

as the MERS recording separates the Debt from the Lien, and this is more so especially upon a sale of the Note and Trust Deed.

13. Plaintiff further alleges that MERS attempts to act as a Nominee for more than one principal, and conceals their identity and that if a Nominee is the same as an agent MERS can not act as an agent for multiple Banks, insurance and title companies and Mortgage Companies because of a serious Conflict of interest.

14. In addition Plaintiff alleges that a Deed of Trust can not lawfully be held by a Nominee who has no financial interest in the instrument without disclosing the true Beneficiary and that where as here a party with No interest in the Note records it in his name it is a Nullity.

15. Plaintiff further alleges that MERS failure to transfer Beneficial interests as the Note and deed are sold further renders the Deed recording a nullity.

16. On information and Belief MERS was not and is not an Agent and has NO right to act for or on behalf of or as a Beneficiary, but is merely a Nominee who holds title in his, her or their name for another, and their title as recorded is defective as the Beneficiary is not disclosed, therefore Plaintiff alleges on information and belief that true title was never perfected for this loan.

17. On information and belief Prado sold the loan immediately after funding and the servicing rights, which on information and belief were transferred to Countrywide Hole Loans.

18. That on or about November 2007 Plaintiff attempted to a modification of his loan and in that regard had contacted Countrywide, who declined to offer Plaintiff any assistance

5

18. (b) On or about June 2008 Plaintiff became in default of the said loan

19.  Countrywide was negligent and allowed the wrong party to begin the foreclosure process as Neither MERS or Countrywide were the Beneficiary of this Loan. In addition a trustee has not lawfully been appointed.

19. (b) that MERS, and Countrywide each claim to be the beneficiary of Plaintiff's Note

20. That none of the Defendants are the Beneficiary under the said Note and Deed(s) of trust.

21. On information and belief Plaintiff alleges that Prado Sold the Trust Deed and note and transferred them by indorsement or assignment to other investors who on several occasions did the same until these Note(s) and Deed(s) were ultimately securitized bundled, pooled and marketed and sold to investors as a mortgage backed security.

22. On Information and belief Countrywide purchased the servicing rights to these loans where from Countrywide was paid between1/4 and ½ of a percent for servicing them.

23. Plaintiff alleges that Mortgage-Backed Securities resemble bonds, instruments issued by governments and corporations that promise to pay a fixed amount of interest for a defined period of time. Mortgage-Backed Securities: are Bond-type investment securities representing an undivided interest in a pool of Mortgages or trust deeds.

24. Mortgage-Backed Securities are created when a company such as but not limited to Bear Stearns, Fanny May, Freddie Mac or Ginny May "BUYS" a bunch of Trust Deeds from a primary lender, such as but not limited to one or more of the

6

Defendants herein or some other unknown lender or investor in their up-line, who then bundles them into a public offering, and then uses the monthly payment of thousands of borrowers, as the revenue stream to pay investors who have "<u>BOUGHT</u>" chunks of the offering.

25. Plaintiff is also informed and believes that these Notes have been securitized to more than one investor at the same time, which is and would be a Fraud.  Plaintiff has attached hereto and Incorporates here in as EXHIBIT "A" a true and correct article taken from the New Your Times which is one of many articles and witnesses that will be called that support this allegation. .

26. On information and belief Plaintiff alleges that none of the Defendants herein have a valid power of appointment as Trustee, and are not the Beneficiary and that the sale of Plaintiff property will be a nullity. .

27. ("MERS") is solely a registration service and has NO interest in the Loans, or any servicing rights, and records the deed in their name as a "NOMINEE" Beneficiary only for the purpose of hiding the true identity of the real Beneficiary as these Notes are sold and transferred and ultimately find their way into one or more trusts. MERS is "strictly" a registration system and nothing more, they make NO investment in these Trust Deeds and they don't even hold the notes or service the loans. MERS was never the Beneficiary as they claim, or even an agent of the Beneficiary, but used to hide the true identity of the Beneficiary, as such there is a question of the Validity of the recording of the MERS Nominee Deed, and the assignments from MERS.

28. On information and belief MERS records the deeds in their name to conceal the true identity of the Beneficiaries as and after the loan is sold and packaged into a security.

29. On information and belief, by MERS recording the loan in their name and no further recording taking place, the Note is thereafter available to be securitized by **two or more lines of investors simultaneously** thus allowing an opportunity for the Note to be used for a Fraudulent purpose which on information and belief has occurred on numerous occasions and with Plaintiff Note.

30. A MERS Deed recording never discloses the true Identity of the Beneficiary

31. While MERS remains on title as a "nominee" for the TD and Note both are sold on one or more occasions afterward and ultimately bundled as a security and sold to a final investor. MERS actually helps to conceal who the real beneficiary is in violation of Nevada statutory law. The Beneficiary is completely shielded and not disclosed as required. Also the forms that they use to give Notices are defective as they lack the required disclosures and are generally ambiguous lacking clarity as to the true nature of the party giving the said notice.

32. Plaintiff has attached hereto and Incorporates herein as Exhibit "B" true and correct copies of decisions of the Federal Court of Ohio relating to alleged lenders who attempted to foreclose on borrowers and were unable to substantiate their ownership of these Notes Some (40) creditor attempts to foreclose were dismissed.

33. An actual controversy has arisen and now exists between Plaintiff and defendants concerning their respective rights, obligations and duties in that Plaintiff contends that none of these defendants had a right to foreclose on Plaintiff' deed of trust, whereas

defendants dispute these contentions and contend that irrespective of the fact that they do not own this security and have sold this security and are no longer the Beneficiary, nor have a power of appointment as a Trustee, and that none of them can produce the original note and or chain of title or paid a valid consideration for these assignments, and that additionally as the recording of these Deeds are a nullity under Nevada Law that regardless they have a right to foreclose.

34. Plaintiff desire a judicial determination of Defendants rights, obligations and duties, and a declaration as to who owns Plaintiff' deed(s) of trust and who has a right to the payments there under and to foreclose thereon, and whether Plaintiff' Property was wrongfully foreclosed.

35. A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiff may ascertain his rights, obligations and duties and to whom they are owed, and what he owes. Plaintiff is under a financial burden and emotional strain which he is suffering due to this unsettled state of affairs.

36. If these Defendants are allowed to perfect their foreclosure on Plaintiff' note and they are not as Plaintiff believes entitled to do so.  Plaintiff will be irreparably damaged in the loss of his property, and his investment in the same.

FIRST CLAIM FOR RELIEF
FOR DECLARATORY RELIEF AGAINST
ALL DEFENDANTS

37. Plaintiff re-alleges and Incorporates all prior allegations as set forth above.

38. Plaintiff alleges that none of the Defendants can be acting as a trustee or successive trustee because they were NOT appointed by a legitimate Beneficiary and therefore have no right to foreclose on his note and deed of trust and the Notices as

9

Complaint

and when recorded are and were invalid because they were not authorized by the

Beneficiary or recorded as required by Nevada Law

39. Plaintiff further alleges on information and belief that the real Beneficiary is

currently being concealed and that this is a further and additional violation of Nevada

Statutory Law.

40. An actual controversy has arisen and now exists between Plaintiff and defendants

concerning their respective rights, obligations and duties in that Plaintiff contends that

none of these defendants have a right to foreclose on Plaintiff' Trust Deed(s),

whereas defendants dispute these contentions and contend that irrespective of the

fact that they Sold their interest in these notes, and do not own the security and are

not the holders of any note in due course or otherwise, and can not produce the

original note and chain of title with proper indorsements or assignments over to them,

and that they are neither the Trustee lawfully appointed or the Beneficiary having paid

real consideration for this Note and that the Recorded Deed is a nullity, that they have

a right to foreclose.

41. Plaintiff desire a judicial determination of Defendants rights, obligations and

duties, and a declaration as to who owns Plaintiff Trust Deed and Note and who has a

right to the payments there under and whether the foreclosure if completed will be

valid and enforceable.

42. A judicial declaration is necessary and appropriate at this time under the

circumstances in order that Plaintiff may ascertain their rights, obligations and duties

and to whom they are owed, and what amount.

Complaint

43. Plaintiff is under a financial burden and emotional strain which they are suffering

due to this unsettled state of affairs.

44. If Defendants are allowed to perfect their foreclosure on Plaintiff note and they are

not entitled to do so Plaintiff will be irreparably damaged in the loss of their property,

and their investment in the same.

### SECOND CLAIM FOR RELIEF
### FRAUD BY DECEPTION
### DEFENDANTS:

Mortgage Electronic Registrations System, Inc.,
Prado

45. Plaintiff re-alleges and incorporates all prior allegations as set forth above

46. Defendants and each of them have represented to Plaintiff and to third parties that

they were the owner of the Trust Deed and Note regarding Plaintiff real property.

47. Plaintiff has relied on the representations of Defendants and has attempted to

negotiate in good faith believing they were the owner of the TD and Note, and that

they had a real and valid ability to foreclose on Plaintiff's home.

48. Plaintiff relied on the representations of these defendants and his reliance was

justified.

49. Plaintiff has recently learned that the Representations made by Defendants were

not true and that these Defendants or any of them are not THE OWNER of the Trust

Deed and Note evidencing Plaintiff TD, or the lawfully appointed trustee, however

they are moving ahead with a foreclosure on Plaintiff' Note and Trust Deed by

deception misrepresenting their ownership and legal authority and at the time they

made the representations for the foreclosure they knew that they had no legal

authority to do so.

50. Defendants knew at the time they made these representations to Plaintiff that they were untrue, and know at the time that they were in the process of foreclosing on Plaintiff' Trust Deed and note that they had no right to do so.

51. Due to Plaintiff' reliance on Defendants representations they have been damaged in an amount that currently exceeds $800,000 and additionally they may be forced to expend the cost and expenses of moving out of their property and the costs to relocate back to the subject Property as well as legal fees to defend against this fraudulent Foreclosure.

52. Defendants conduct as set forth above was intentional, oppressive fraudulent and malicious so as to justify an award of exemplary damages and that their conduct was in reckless disregard for Plaintiff' financial or emotional well being and therefore Plaintiff request exemplary damages of $5,000,000.

PLAINTIFF THIRD CLAIM FOR RELIEF<br>Negligence<br>Defendant Countrywide

53. Plaintiff re-alleges and incorporates all prior allegations as set forth above

54. On or about June 2008  MERS or Countrywide authorized the trustee to begin the foreclosure process, at the time of the "authorization" neither of these defendants were the Beneficiary of this Note and Trust Deed as Countrywide was only the servicer of the loan, and MERS was never a real Beneficiary.  However even though neither one of these Defendants were the Beneficiary each claimed that interest, especially Countrywide.

55. Plaintiff is informed and believes and based thereon alleges that Countrywide has been named a defendant in several lawsuits alleging that the sale of real property at

12

auctions were unlawfully carried out, therefore they either knew or should have known

that they lacked the authority they are exercising.

56. By virtue of the Nature of a Non Judicial foreclosure, Countrywide owed Plaintiff a

special duty of care to insure that the proper party was attempting to foreclose on their

property

57. That Countrywide was negligent and breached this duty of care and their breach of

this duty is the direct and proximate cause of Plaintiff damage and injury.

58. That by virtue of Defendants negligence Plaintiff has had their home wrongfully

placed in foreclosure by a loan servicer rather than the Beneficiary.

59. Plaintiff has therefore suffered and will continue to suffer damages that are

ongoing but at this time are believed to exceed $1,000,000.

60. That these damages were foreseeable by Countrywide, as they were not lawfully

appointed Trustee or properly authorized to issue the foregoing and stated notices or

to foreclose on Plaintiff's Real property.

## Alternatively
### PLAINTIFF FORTH CLAIM FOR RELIEF
### TO SET ASIDE THE FORECLOSURE SALE
### AND REINSTATE PLAINTIFF ON TITLE.
### ALL DEFENDANTS

61. Plaintiff re-alleges and incorporates all prior allegations as set forth above

62. If Plaintiff's property is sold at an auction, the sale will not be carried out as

required and authorized by virtue of and under Nevada Law.

63. The sale will be wrongfully carried out and Plaintiff's property will have been

unlawfully sold at the direction of these defendants.

13

64. Defendants did not and do not have permission or consent for the sale to take place nor did they have proper notices recorded under Nevada Law, Nor were they the Beneficiary or trustee at the time of the commencement of the Foreclosure and sale. Plaintiff request the court to set aside the sale and reinstate Plaintiff on title.

## PLAINTIFF FIFTH CLAIM FOR RELIEF
### SLANDER OF TITLE
### ALL DEFENDANTS

65. Plaintiff re-alleges and incorporates all prior allegations as set forth above

66. Plaintiff alleges that defendants are in the process of filing and recording against Plaintiff's Real property a notice of Default and Intent to foreclose and thereafter set a sale date and thereafter sold the property and will record a trustee's deed taking title form Plaintiff who are rightfully entitled thereto.

67. That these recordings will be wrongfully recorded, and unlawfully recorded and are an intentional, knowing and willful act.

68. That this recording of these false notices which were or should have been know by the defendant at the time of their recording has Slandered Plaintiff title to his real property and that Plaintiff has been damaged by this act and therefore seeks exemplary as well as actual damages for Defendants knowing and improper misconduct of $5,000,000

### PLAINTIFF SIXTH CLAIM FOR RELIEF
### FRAUD IN lending practices
### DEFENDANTS MERS, Countrywide, and Prado
Plaintiff request either
Reformation Of Contract Based On Lender FRAUD
Which Caused A Partial Failure Of The Consideration
Secured By The Note And Trust Deed
or
Fraud Damages if her property is foreclosed

14

69. Plaintiff re-alleges and incorporates all prior allegations as set forth above.

70. On information and belief Plaintiff alleges that each of the Defendants and especially these co-conspirators and unnamed defendants Deutsche Bank and JP Morgan intentionally and knowingly created a model that was intended to cause a spiral of inflation and then a collapse of the Real Estate Market by expanding the sub prime base and lending money to borrows that they knew lacked the means to repay the loans, and to insure that the borrowers would collapse under the weight of the Mortgage payments they initiated an ARM type of standard loan with payments that graduated over periods of time.

71. That evidence has been available to the lending community dating to1995 which showed and established that Sub-prime loans had traditionally been a problem even with fixed rate loans.

72. That armed with this vast array of knowledge, Deutsche Bank, Countrywide and Prado and these defendants created and modeled an industry standard for these loans which included among other criteria less stringent requirements, such as No doc loans and ARM'S (Adjustable Rate Mortgages) all calculated to lend the borrower to early default and foreclosure.

73. Plaintiff alleges on information and belief that in 1933, in the wake of the 1929 stock market crash and during a nationwide commercial bank failure and the Great Depression, two members of Congress put their names on what is known today as the Glass-Steagall Act (GSA).

74. This act separated investment and commercial banking activities. At the time, "improper banking activity", or what was considered overzealous commercial bank

15

Complaint

involvement in stock market investment, was deemed the main culprit of the financial crash. The Glass-Steagall Act was written to limit the conflicts of interest when commercial banks are permitted to underwrite stocks or bonds.

75. On information and belief Plaintiff alleges that for more than 20 years the Banking industry whittled away at Glass-Steagall before finally breaking down its regulatory restrictions in August 1987 that was when *Alan Greenspan* – (formerly a director of J.P. Morgan) and a proponent of banking deregulation -- became chairman of the Federal Reserve Board.

76. Plaintiff alleges that with Greenspan in charge, in 1990, J.P. Morgan became the first bank to receive permission from the Federal Reserve to underwrite securities, so long as its underwriting business did not exceed a10 percent limit.

77. In December 1996, with the support of Chairman Alan Greenspan, the Federal Reserve Board issued a precedent-shattering decision permitting bank holding companies to own investment bank affiliates with up to 25 percent of their business in securities underwriting (up from the 10 percent limit).

78 This expansion of the loophole created by the Fed's (Greenspan) 1987 reinterpretation of Section 20 of Glass-Steagall effectively rendered Glass-Steagall obsolete

79. In 1999, after 25 years and $300 million of the banks lobbying efforts, Congress, aided by President Bill Clinton, finally repealed Glass-Steagall. This paved the way for the problems we are now facing.

80. After the demise of Glass-Steagall JP Morgan and defendants with their subsidiaries began to make loans with the idea that those loans would be securitized

and sold off to investors, this allowed for two things, (i) immediate profits, and (ii) no

requirement to maintain loans against capital reserves. In other words the Banks

could make unlimited numbers of loans and had a ready market to dispose of them

through investors, thereby enhancing their profits through the points and underwriting

and associated loan fees they made up front, and the stream in excess of the actual

loan amount they received from the sale of the Notes and Trust Deeds or Mortgages.

81. To further this scheme Defendant **Deutsche Bank AG**, initiated a meeting at

which Goldman Sachs Group Inc., Bear Stearns Cos., Citigroup Inc., and JPMorgan

Chase & Co. were invited and were present and conceived the sub prime model that

they securitized and marketed to investors as Derivatives, "Mortgage Backed

Securities" This group became known as the "Group of Five"

82. Derivatives are a very dangerous instrument as they are based on a value that the

contracting parties have no interest in, the value is based on the value of the debt

secured and the credit of the borrower which for sub prime loans was at best

questionable.

83. Plaintiff is informed and believes that At the time the Group of (5) developed the

marketing strategy and scheme to marker large numbers of Sub Prime Loans they

had in front of them reports from the American Bankers association, Inside Mortgage

Finance and the Federal Reserve System that demonstrated by charts and graphs,

that during the period from 1995 through 2003 Sub Prime loans even on Fixed

interest rates had an unusually high rate of failure and default. Armed with this

knowledge the Banks determined to move ahead knowing that they would end up with

a large number of defaults and foreclosures and that these large numbers of defaults

and foreclosures would destroy the Mortgage Market and they would end up

foreclosing on millions of these Notes and the homes secured by them.

84. Loans were made through warehouse lines established by the banks for their

subsidiary Mortgage Companies which they acquired or establish to enter this

temporary but lucrative market,  then sold by the initiating lender to its up-line bank,

that bank immediately sold the loan to its up-line, sort of like a reverse Multiple Level

Marketing program.

85. Ultimately after sales sometimes as many as 5 to 8 up-line sales the loans were

bundled into a group of 9000 or more loans and sold to a corporation or LLC or one

was created for the purpose where the debt instruments were securitized and sold off

in chunks through Wall Street to high income and average investors.

86. In many instances Plaintiff is informed and believes the Notes securing Real

Property were securitized to more than one source which act constitutes Fraud.

87. Many of these packages were actually underwritten by the banks themselves.

88. One bank in the chain retained the servicing rights to these loans or sold those

rights off separately. Because of the confusion, and the multiple sales and multiple

repurchase agreements between the banks and the entities (some times more than

one) that hold the debt securities, in most cases the wrong party today is attempting

to foreclose on Mortgage  loans. And in the instant case these defendants are the

incorrect party.

89. Greenspan and the banking industry set the pace for this disaster through their

negligence, or intent which was exacerbated by greed. They have just duplicated the

events that caused the Market and Bank crash of 1929. Bear Sterns, Citibank, Merrill

Complaint

Lynch and Washington Mutual were on the verge of collapse until they were bailed

out by money that may have come from the Mid East, and several other major banks

are on the edge of this same collapse, to date more than 254 Bank related Mortgage

companies have so far failed including, New Century Mortgage, and all of this was

foreseen by these defendants, as this defendant on information and belief when their

own product was securitized shorted those securities to make even larger profits at

the risk to their own investors. In addition Plaintiff is informed and believes that the

internal book keeping department at Deutsche bank knew and reported the problem

early on and before the sub prime mess got out of control.  Deutsche bank knew or

should have known that there sub prime product was destined to cause a market melt

down.

90. Plaintiff alleges on information and belief that by 2003 most creditworthy

borrowers had already refinanced their houses at 2003's record-low mortgage rates.

91. Plaintiff further alleges that by 2004 there was a Global "investor" demand for

these derivatives, "Mortgage Backed Securities". To meet this demand Wall Street

had to find a new source of loans. Those still available mainly involved subprime

borrowers, who paid higher rates because they were seen as credit risks.

92. Plaintiff alleges on information and belief that In February of 2004 Representatives

of five Wall Street banks met to put together the Sub Prime Mortgage loan model

which included the securitizing of Sub Prime Mortgage, and Trust Deed Notes. Those

Banks on information and belief were Defendant Deutsche Bank AG, Goldman Sachs

Group Inc. Bear Stearns Cos. Citigroup Inc., and JPMorgan Chase & Co.

93. Plaintiff is also informed and believes that the foregoing Banks plus at least 50

other traders and lawyers met at **Deutsche Bank's Wall Street office** to help set the trading rules and design the new "Sub Prime" product.

94. Plaintiff is also informed and believes that the Traders called themselves the "group of five," and that meeting became a turning point in the history of Wall Street and the global economy, in fact it destroyed both..

95. Plaintiff is further informed and believes that ***at subsequent meetings The group of five and their attorneys designed new standardized contracts that would allow firms to protect themselves from the risks of subprime mortgages, enable speculators to bet against the U.S. housing market, and help meet demand from institutional investors for the high yields of loans to homeowners with problem or substandard credit.*** Therefore they KNEW that these loans would default in large numbers

96. The tools they designed were so negligently or intentionally thought out and designed that they magnified losses so much that a small number of defaulting subprime borrowers could and did devastate securities held by banks and pension funds globally, freeze corporate lending, and bring the world's credit markets to a standstill.

97. The standardized contract the group of Five created for mortgage-backed securities were complicated, layered instruments intending to shield the banks from Exposure and lawsuits.

98. The subprime boom for a short period of time enriched investment bankers, lenders, brokers, investors, realtors and credit-rating companies. It allowed hundreds of thousands of Americans to buy homes they never believed they could afford, and in

fact they couldn't.

99. In New York, the ratings companies Standard & Poor's, Moody's Investors Service and Fitch Ratings put their stamp of approval on securities backed by loans to people who couldn't afford them. They disregarded documentary evidence that these securities were in fact flawed and a crisis waiting to happen. They failed to take into consideration or use historical data to grade the securities and failed to adjust to the widespread weakening of criteria used to qualify high-risk borrowers.

100. On information and belief <u>Deutsche Bank's intent</u>--on that February evening in 2005: was to design a new financial product that would standardize mortgage-backed securities, including those based on high-yield subprime loans, paving the way for their rapid growth and their ultimate collapse.

101. In February 2005, pension funds, banks and hedge funds owned fixed-income securities that were earning returns close to historic lows. AAA-rated securities based on home loans offered yields averaging a full percentage point higher than 10-year Treasuries at the time and the rating companies were ready and willing to place their stamp of approval on this flawed concept.

102. The banks wanted more mortgage-backed securities to sell to clients. Creating a standardized ``synthetic'' instrument, or derivative, would <u>leverage</u> small numbers of subprime mortgages into bigger securities. In this way, the firms could produce enough to meet global demand.

103. As the group nailed down the details, the International Swaps and Derivatives Association, which sets trading terms for dealers, arranged conference calls including more of Wall Street to promote the securities.

Complaint

104. At this point, some of the biggest mortgage underwriters -- Lehman Brothers, Merrill, Bank of America Corp. and Morgan Stanley –became part of the Group.

105. By June, of 2005 a new contract was agreed upon and was endorsed by all of the members, and other remaining banks that hadn't been party to the group of five negotiations signed on, this includes Deutsch Bank who initiated the concept. The banks would go on to create similar derivative contracts to trade securities backed by loans for commercial buildings and collateralized debt obligations, or CDOs, which are securities backed by various kinds of debt including Credit Card, and Student and auto Loans.

106 The banks then created an index to represent the market and help hedge general market exposure. It was called the ABX-HE and would be similar to the indexes traders use for baskets of stocks. The participants believed, that the index would add to the market's liquidity, or depth, by attracting more trading.

107 The new derivatives were a hit among the group of five's customers -- the banks and other institutional investors bought them to lock in high yields.

108. Plaintiff is informed and believes that by September 2005, some within Deutsche Bank were already beginning to worry about defaults on subprime mortgages and how that might affect the securities based on them, and that a team of Deutsche Bank analysts that month warned of growing subprime market risks. Yet the Banks moved ahead full steam creating these loans, knowing that they would collapse.

109. The ABX-HE index started trading on Jan 19, 2006. At 8 a.m. Shortly after the opening, Quotes from brokers selling the ABX were dropping, an indication that a number of investors wanted to short the securities.

110. On its first day, the index traded more than $5 billion. The cost of wagering against the securities was rising, a sign that traders saw an increased chance of default, however even knowing this problem existed, the banks and the defendants herein continued to promote sub-prime loans to people who couldn't afford the monthly payments.

111. Plaintiff is informed and believes that in the months to come, Deutsche Bank and at least one other member of the group of five, Goldman Sachs, began using subprime derivative contracts to bet the other way "Short Selling" and profit from a market destined to collapse.

112. Deutsche Bank **having created the Model** had "insider knowledge" of the damaging events that were about to unfold in the U. S housing market. They new the risks of a downturn were significant enough to justify the millions of dollars it would cost to "short," or wager against, subprime securities. And they invested to obtain a six-fold return.

113. Plaintiff alleges that the derivatives the group of five helped create –and that ALL banks and lenders participated in including the original lender of Plaintiff and which banks packaged into Collateral Debt Obligations–CDOs -- caused the subprime crisis, and the depreciation of homes and the loss of their value and that these Defendants and each of them participated in and were part of the cause of this sub-prime crisis and the loss of the value of Plaintiff real property.  And that they knew at the time that the loan was made to Plaintiff that he would be caught up in this mess and they would ultimately foreclose on their home.

114. Plaintiff alleges that the banks and particularly the defendant herein Planned and

artificially created a run of inflation by making loans to anyone who could sign an X by

their name as long as they were breathing, then intentionally crashed the market by

stopping to make such loans and viciously foreclosing on the sub prime and prime

lenders caught up in the swindle created by Deutsche Bank

115. Plaintiff alleges that due to the Fraud and concealment or at best the negligence

of the defendant Deutsche Bank or their lack of concern for home borrowers as they

were profit motivated the value of Plaintiff home has diminished substantially and

Plaintiff have lost a significant equity therein and to add insult to injury Defendant

Deutsche Bank then authorizes a foreclosure but had no right to do so.

116. Defendants breached that duty of care owed to Plaintiff by their greed, Fraud and

or negligence in causing the Direct Equity Mortgage to rise by making loans to people

they could not repay the loan then fall as the defaults rose and bank foreclosures

became a staple leaving Plaintiff with a Mortgage and Note that exceeded the value of

their home.

117. That the acts of these Defendants' were the direct and proximate cause of

Plaintiff injury and damages.

118. That by virtue of Defendants carelessness Plaintiff have been damaged in the

loss of the equity in their home as well as the loss of a substantial value therein and

the actual loss of their property.

119. That Plaintiff relied on the representations and or their concealed facts and their

reliance was justified, and in doing so they have been damaged in the loss of equity in

their home and their credit standing.

120. That due to the actual Fraud of these defendants Plaintiff consideration for the

1  Note and Mortgage has partially failed and their property has declined in market

2  value.

3
4  121. That Plaintiff seeks (i) restitution of their property (ii) that the sale be set aside

5  and (iii) a Reformation of the Note and Mortgage to the actual present value of their

6  home less their equity at the time of the loan, as will be demonstrated at the time of

7  trial, plus Actual damages, Special Damages and Exemplary damages.

8
9  122. That by virtue of Defendants fraud which amounts to oppression and Malice

10  Plaintiff is entitled to exemplary damages of $10,000,000.00

11  PLAINTIFF SEVENTH CLAIM FOR RELIEF
12  CIVIL CONSPIRACY
   To Prevent Borrowers from paying off their mortgages
13  DEFENDANT
   MERS and Countrywide
14  Does 1-X and Roes 1-X

15  123. Plaintiff re-alleges and incorporates all allegations as set forth above.

16
17  124. Plaintiff is informed and believes and thereon alleges that, at all times herein

   mentioned each of the defendants sued herein was the agent and employee of each

18  of the remaining defendants and were at all times acting within the purpose and scope

19  of such agency and employment.

20  125. On or about May, 2006 and prior thereto, Defendant MERS, and Prado and the

21  other un named defendants and the Doe Defendants and each of them knowingly and

22  willfully conspired and agreed among themselves to place Plaintiff and others in an

23  interest rate and with loan terms that was in excess of the rate or loan they were

24  qualified for, in order that Deutsche Bank and JP Morgan would ultimately acquire

25  their loan and foreclose thereon, taking out foreclosure insurance therefore to insure

26  against loss.

27  126. Plaintiff is informed and believes that their notes were securitized to more than

28  one trust of which either JP Morgan, or Deutsche Bank were the trustees and could

   cover over their fraud.

25

127. That by virtue of defendants acts Plaintiff have been made to pay a higher Mortgage Payment that could have exceeded $250.00 a month, and to ultimately default on their loan and the damage and injury to their credit standing all anticipated and planned by Defendants.

128. Defendants and the Doe Defendants and each of them did the acts and things herein alleged pursuant to, and in furtherance of, the conspiracy and above-alleged agreement.

129. Defendants and each of them as identified and known and as acquired this loan and its Notes in the Chain of title furthered the conspiracy by cooperation with each other and or lent aid and encouragement to each other and or ratified and adopted the acts of each other as they either participated in the conspiracy or acquired the Notes and deeds of Trust subject thereto in that each party was aware of the conspiracy to foreclose on large numbers of properties

130. As a proximate result of the wrongful acts herein alleged Plaintiff has been generally damaged in the sum of approximately and or in excess of $10,000,000.

131. Due to the acts of these defendants, Plaintiff have struggled to make these payments and have been under deep and severe emotional distress all to their damage and injury for which they seek compensation in excess of $10,000,000.

132. Defendants and each of them did the things herein alleged maliciously and to oppress Plaintiff. Plaintiff is therefore entitled to exemplary or punitive damages in excess of the sum of $10,000,000.

PLAINTIFF EIGHTH CLAIM FOR RELIEF

Statutory Violation of RESPA
12 USC section 2607 (b) illegal kickbacks
DEFENDANTS: PRADO, Direct Equity Mortgage

132. Plaintiff re-alleges and incorporates all prior allegations as set forth above

133. Plaintiff is informed and believes that Direct Equity Mortgage was paid excessive points and fees during the funding and back end fees after the funding and outside of the escrow by PRADO to place Plaintiff in a less desirable loan. And that PRADO was

26

paid a point spread after the funding and outside off the escrow by the Bank or Trust

that acquired the Note from Prado. Plaintiff also is informed and believes that they

structured ½ of a point for servicing this loan instead of the Normal ¼ of a Point

because of the way the loan was designed, and as these percentage of points affect

the loan and the loan terms and Plaintiff's obligation there under they were required to

be disclosed on the Truth In Lending Statement but Defendant failed to do so.

134. Plaintiff is further informed that Direct Equity Mortgage was paid a fee by

PRADO which was paid outside of escrow ("POC") and after the closing as a Yield

Spread Premium or point spread of $3,746.23 which is a kick back and is an illegal fee

and that this fee which Plaintiff have recently discovered is an illegal fee. Plaintiff also

believes that Direct Equity was paid excessive fees in the following Origination fee of

$2,997.00 Discount Fee of $2,997.00, Broker Fee of $650.00 and a Processing Fee of

$495.00 for a total of fees paid $7,139.00 plus the Yield Spread Premium of $3,746.23,

and that at best they were entitled to approximately $1,000.00 and the additional was

excessive and in violation of the Statutory requirements of RESPA

135. A yield Spread Premium a fee that is considered a kick back as it is paid for

placing the borrower into a higher interest rate loan or for some other disadvantage for

the borrower and an advantage to the initial lender and the other lenders in the chain

of title. The YSP is a rate spread based on the interest rate and yield of the loan.

136. Plaintiff is further informed and believes that each of the other entities that bought

and sold this note received back end payments upon their sale and acquisition of these

notes which also were not disclosed, that these fees and payments are based on the

loan terms and interest rate charged to Plaintiff and that these fees and payments are

27

a part of the loan and the cost of the loan to Plaintiff which are and were required to be

disclosed on the TILA and by the RESPA disclosure requirements.

137. That the fees and kickbacks were illegal under 12, USC 2607(b) and that

therefore as provided by Statute 12, USC 2607(d) Plaintiff is entitled to and seeks

treble damages therefore in a sum equal to or which exceeds $12,000 from Direct

Equity Mortgage and PRADO and from PRADO a separate sum in excess of

$21,000.00 and which sum may exceed $ 250,000.00 for its points received upon the

sale of the note.

PLAINTIFF'S NINTH CLAIM FOR RELIEF
FRAUD
DEFENDANTS: PRADO, Direct Equity Mortgage,

138. Plaintiff re-alleges and incorporates all prior allegations as set forth above

139. On or about May 2006 DIRECT EQUITY MORTGAGE provided Plaintiff a loan

through PRADO. DIRECT EQUITY MORTGAGE was compensated for this loan by

being over paid for its services, and a Yield Spread Premium in the sum of $3,746.23

and out side and after the close of Escrow. According to RESPA 12 USC 2607 a yield

Spread Premium is an illegal kick back. According to RESPA 12 USC 2607 fees paid

must be in accordance with the value of the work performed.

140. Defendant PRADO on information and belief paid DIRECT EQUITY

MORTGAGE fees above and beyond the value of the services actually performed and

an illegal kickback as stated above.

141. On or about May 2006. Plaintiff acquired the foregoing property by virtue of the

said funding through DIRECT EQUITY MORTGAGE and PRADO based on the

representations of Both Defendants that the loans were the best they could obtain for

them.

28

Complaint

142. At the time of the loan Plaintiff is informed and believes that certain information was concealed from him, such as that PRADO was working with DIRECT EQUITY MORTGAGE against Plaintiff's interest in this loan, for example Plaintiff is informed and believes that PRADO paid DIRECT EQUITY MORTGAGE a Yield Spread Premium as set forth above in order to make the loan more favorable to PRADO and less favorable for Plaintiff by providing a higher rate of interest to Plaintiff or some less desirable terms of the loan, in order that the loan  was worth more money to PRADO when and as they sold his loan(s)

143. Defendants represented to Plaintiff that DIRECT EQUITY MORTGAGE was working for Plaintiff and in their best interest to obtain for them the best loan and at the best rates available.

144. On or about May, 2006 Plaintiff entered into the loan for the foregoing property based on the representations of these Defendants.

145. That Plaintiff relied on the representations and his reliance was justified.

146. That at the time DIRECT EQUITY MORTGAGE made these representations to Plaintiff they knew that they were untrue and that these representations were material representations.

147. That the foregoing representations were made in order to induce Plaintiff to act on and take the said loan(s) in order for both defendants to make a substantial amount of money thereby and there from.

148. Plaintiff were induced to and did take this loan based on the said representations

149. That Plaintiff were induced to rely and did rely on the representations of these

defendants through deception and his reliance was justified as he believed that

DIRECT EQUITY MORTGAGE was working for him and in his best interest.

150. That by virtue of Plaintiff's reliance and the increased interest he was made to

pay, he has been damaged in the loss of his good credit and is now being involved in

litigation that he did not bargain for, all to his damage and injury.

151. That Plaintiff's actual damages so far exceed $800,000.

152. That defendants misconduct was malicious oppressive and fraudulent and was

in reckless disregard for Plaintiff' financial and emotional well being and Plaintiff

therefore requests Exemplary damages of $5,000,000.

PLAINTIFF TENTH CLAIM FOR RELIEF

BREACH OF FIDUCIARY DUTY

DEFENDANTS PRADO AND DIRECT EQUITY MORTGAGE

153. Plaintiff re-alleges and incorporates each and every allegation as set forth above

154 Plaintiff alleges that Defendant Direct Equity Mortgage at all times relevant was in

a fiduciary relationship with Plaintiff and owed Plaintiff a duty of Care, of Loyalty and

Honesty.

155. That Defendant was in a superior position and had control over Plaintiff and the

loan Plaintiff would accept and therefore Owed Plaintiff a special duty of honesty.

156. That Defendant Direct Equity Mortgage and Prado entered into a civil conspiracy

for the purpose of placing Plaintiff in a loan that was not to Plaintiff' advantage but

was for the advantage of Defendants and both of them as follows:

157. Defendant Prado paid Direct Equity Mortgage a Yield Spread Premium as a kick

back for placing Plaintiff in a loan with a higher interest rate then Plaintiff qualified for

or that Defendant Prado provided for other borrowers, or placed Plaintiff on some other based on terms less favorable to Plaintiff and that was not to their advantage.

158. The purpose of the Yield Spread Premium also known as a kick Back was concealed from Plaintiff.

159. .Defendant Direct Equity Mortgage owed Plaintiff a special duty of Honesty and Loyalty requiring Defendant to act in the best interest of Plaintiff

160. .Defendant Direct Equity Mortgage breached this duty of care by acting in their own interest and against Plaintiff'

161. Defendant Prado conspired with defendant Direct Equity Mortgage to induce him or it to breach this duty owed to Plaintiff and is therefore liable for all damages sustained by Plaintiff thereby.

162. By Virtue of Defendants acts which were intentional and for a monetary gain Plaintiff have been damaged as follows

(a)The additional interest paid during the term of the loan which is believed to exceed $200,000

163. That Defendants conduct was oppressive, malicious and Fraudulent so as to justify an award or exemplary damages and that by virtue of defendants conduct which was in reckless disregard for Plaintiff's financial or emotional well being Plaintiff is entitled to and seek exemplary damages of $10,000,000.

PLAINTIFF ELEVENTH CLAIM FOR RELIEF
CIVIL CONSPIRACY
TO BREACH OF FIDUCIARY DUTY
DEFENDANT
DIRECT EQUITY MORTGAGE AND, Prado
Does 1-X and Roes 1-X

164. Plaintiff re-alleges and incorporates all allegations as set forth above.

31

165. Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned each of the defendants sued herein was the agent and employee of each of the remaining defendants and was at all times acting within the purpose and scope of such agency and employment.

166. On or about May, 2006, Defendant Direct Equity Mortgage and Prado and each of them knowingly and willfully conspired and agreed among themselves to place Plaintiff in an interest rate or other loan that was more advantageous too them and less advantageous to Plaintiff, in order that Prado would pay to Direct Equity Mortgage a Yield Spread Premium of at lease $3,746.23

167. Defendant Direct Equity Mortgage at the time had a Fiduciary relationship with Plaintiff and owed Plaintiff a duty of honesty and loyalty.  Defendant Prado either knew or shown have known of this relationship and duty.

168, Defendant Direct Equity Mortgage breached this duty of care by acting in their own interest rather than in the best interest of Plaintiff.

169. Defendant Prado aided and or induced Defendant Direct Equity Mortgage to breach this duty for the benefit that Prado would derive upon its sale of the Note due to the higher interest Rate and or terms to Prado's Advantage and the yield Spread.

170. That by virtue of defendants acts Plaintiff has been made to pay a higher Mortgage Payment that could have exceeded $250.00 a month, and to ultimately default on his loan and the damage and injury to his credit standing.

171. Defendant Direct Equity Mortgage and Prado and the Doe Defendants and each of them did the acts and things herein alleged pursuant to, and in furtherance of, the conspiracy and above-alleged agreement.

172. Defendants and each of them as identified and known and as acquired this loan and its Notes in the Chain of title furthered the conspiracy by cooperation with each other and or lent aid and encouragement to each other and or ratified and adopted the acts of each other as they either participated in the conspiracy or acquired the Notes and deeds of Trust subject to, in that each party was aware that the kick back (YSP) was paid and the purpose of the payment and the additional value of the loan due to

this increased interest rate, and that knowing these things they acquired the Notes and the payment stream there from.

173. As a proximate result of the wrongful acts herein alleged Plaintiff have been generally damaged in the sum in excess of $250,000

174. Due to the acts of these defendants, Plaintiff has struggled to make these payments and have been under deep and severe emotional distress all to their damage and injury for which they seek compensation.

175. Defendants and each of them did the things herein alleged maliciously and to oppress plaintiff. Plaintiff is therefore entitled to exemplary or punitive damages in the sum of $5,000,000.

WHEREFORE, Plaintiff demands judgment for:

1. A Mandatory Injunction and order, requiring Defendant to Reinstate Plaintiff on title to their Property, and a restraining order preventing Defendants and his, hers, or its agents, employees, officers, attorneys, and representatives from engaging in or performing any of the following acts: (i) offering, or advertising this property for sale and (ii) attempting to transfer title to this property.

2. Actual Damages against defendant in excess of $10,000

3. Exemplary Damages in excess of $10,000

4. Costs of this action, and attorney's fees as they become appropriate

5. For a declaration that Defendants are not the legal owners of the note and Trust Deed and had no right to foreclose on Plaintiff property.

6. To set aside the Foreclosure and For reinstatement of Plaintiff on title.

7. For such other and further relief as the court deems proper

Dated: July 1, 2008

Sam Huynh

33

VERIFICATION

I, Sam Huynh am the Plaintiff in the above-entitled action. I have read the foregoing

Complaint and know the contents thereof. The same is true of my own knowledge, except

as to those matters which are therein alleged on information and belief, and as to those

matters, I believe it to be true.

I declare under penalty of perjury that the foregoing is true and correct and that her

declaration was executed at Clark County, Nevada.

DATED: July  1 , 2008

Sam Huynh

ACKNOWLEDGMENT

Before me a notary public in and for the County of Clark, State of Nevada personally

appeared: Sam Huynh who upon satisfactory proof shown to me established that she

was the party who signed the foregoing complaint.

Dated this 1ST day of July 2008

Notary Public in and for said County and State

YVONNE TOVES
Notary Public, State of Nevada
Appointment No. 08-5553-1
My Appt. Expires Nov 14, 2011

34

Complaint